# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KEISHA TAMARA HOUSTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:08CV826 |
| | ) | |
| DANYALE PERKINS and | ) | |
| PFIZER, INC., | ) | |
| Defendants. | ) | |

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on the Motion for Summary Judgment of Defendants Danyale Perkins and Pfizer, Inc. (Docket No. 33.) Plaintiff has responded in opposition to this motion, and Defendants filed a reply brief. (Docket Nos. 35, 39.) For the reasons stated herein, this Court recommends that Defendants' motion for summary judgment be granted and that this action be dismissed.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff Keisha Tamara Houston, an African-American female, worked in pharmaceutical sales for approximately seven years before accepting employment from Defendant Pfizer as a sales representative in March 2006. (Docket No. 35, Pl.'s Mem. in

---

[1] Where facts are disputed, the facts are viewed in the light most favorable to Plaintiff, the party responding to Defendants' summary judgment motion.

Opp'n to Defs.' Mot. for Summ. J., Ex. A, Affidavit of Keisha Houston ("Houston Aff."), at 1.) She worked in the Animal Health Division of Pfizer from that time until she was laid off due to a corporate restructuring in January 2009. (*Id*. at 1, 6.) Plaintiff worked under the supervision of Defendant Perkins, an African-American female. (*Id*. at 1.) Plaintiff states that Defendant Perkins treated her differently than Plaintiff's white counterparts because Plaintiff is black. (*Id*. at 2.)

In July 2006 shortly after Plaintiff was hired, she, Defendant Perkins, and Tiffany McGee (an African-American female employee of Pfizer), had a conversation about Defendant Perkins' expectations for new employees. (*Id*.) Defendant Perkins told them that she expected more from Plaintiff and Ms. McGee because they were black. (*Id*.) Defendant Perkins said that she expected Plaintiff and Ms. McGee to dress in professional business attire for sales meetings even though "they" will dress casually. (*Id*.) With regard to weekly sales reports, Defendant Perkins noted that their white counterparts may write one and two-lined sentences, but she expected Plaintiff and Ms. McGee to fully expound on every thought. (*Id*.) Defendant Perkins said that her expectations would always be higher for Plaintiff and Ms. McGee. (*Id*.) When Plaintiff wrote her first weekly sales report and emailed it to Defendant Perkins for approval, Defendant Perkins responded that blacks needed to go the extra mile and not take short cuts. (*Id*.)

In August 2007, Plaintiff was calling on veterinary customers, and Defendant Perkins was riding along with her. (*Id*.) When the veterinarian left the office where the three were meeting, Defendant Perkins told Plaintiff that she had mispronounced the word "ask," and told Plaintiff that she needed to learn how to speak. (*Id*.; Docket No. 34, Defs.' Mem. in Supp. of Mot. for Summ. J., Ex. A, Deposition of Keisha Tamara Houston ("Houston Dep."), at 109.) Defendant Perkins said that people would not tell Plaintiff how stupid she sounded because they think all black people talk that way. (Houston Aff. at 3.) Defendant Perkins told Plaintiff that she was sending her to speaker training in Pennsylvania and that Plaintiff was an embarrassment to her. (*Id*.)

Also in August 2007, at the end of the day described above, Defendant Perkins told Plaintiff that Plaintiff was embarrassing her because Plaintiff's sales numbers were not up to par with her white counterparts for the new product, Cerenia. (*Id*.) Defendant Perkins told Plaintiff, "How do you think I feel when I look at your numbers and my only black employee is last?" (*Id*.) Perkins told Plaintiff that it was her responsibility to change the perception of her white counterparts about black people, and she could not do that from the bottom. (*Id*.)

In August 2006 in Nashville, Tennessee, Defendant Perkins called Plaintiff while Plaintiff was traveling to a district sales meeting to ask if Plaintiff could arrive 15 minutes

-3-

early for the meeting and stay after everyone left. (*Id*.) Defendant Perkins said that blacks have a tendency to be late, and she wanted Plaintiff to get off to a great start. (*Id*.)

During the time Plaintiff worked under Defendant Perkins, Pfizer implemented a program which provided coupons to veterinarians and animal hospital employees when they sold the Pfizer heartworm product "Revolution." (*Id*.) The veterinary employees would mail in these coupons and receive a check from Pfizer based on the amount of product sold. (Docket No. 35, Ex. F, Deposition of Daniel Scott Kramer, at 15-20.) Pfizer placed the name of the sales representative on the check in order to generate good will. (*Id*. at 48.) When this program was ending, there was confusion which resulted in checks deposited over a three-day period being rejected by Pfizer's bank for insufficient funds. (Docket No. 34, Ex. P, Letter of Dan Kramer to Revolution Team, attached to Plaintiff's Deposition (Ex. A).) This resulted in the veterinary customer incurring bank penalties in addition to their checks not being honored. (*Id*.) Pfizer implemented a plan to issue replacement checks to the affected customers with an added $30 to cover any bank penalties. (*Id*.) The plan also included Pfizer sending the customer a separate note of apology along with a complimentary CD player. (*Id*.)

The bank rejected the check of Beth Shelton, a client of Plaintiff, for insufficient funds under this program, and Ms. Shelton incurred a bank penalty charge. (Docket No. 35, Ex. A, Houston's Aff. at 4.) Ms. Shelton contacted Plaintiff, and Plaintiff provided her with

-4-

a $15 "food voucher" for a meal at a local restaurant. (*Id*.) Defendant Perkins became aware that Plaintiff provided Ms. Shelton with this voucher during a ride-along on December 4-5, 2007. (Docket No. 34, Ex. Q, Field Trip Coaching Guide, attached to Plaintiff's Deposition (Ex. A).) Defendant Perkins advised Plaintiff that it was a violation of company policy to provide customers with gift cards or cash equivalents.[2] (*Id*.)

Plaintiff came to believe that the Revolution program constituted an ethical violation. (Docket No. 35, Ex. A, Houston's Aff. at 4.) She contacted Pfizer's anonymous hotline and inquired about what she believed to be a company violation associated with the Revolution program. (*Id*.) She also complained about the bounced checks. (*Id*.) About two days after Plaintiff complained "anonymously," Defendant Perkins "admonished" Plaintiff for violating company policy for providing Beth Shelton with the food voucher. (*Id*.)

On December 15, 2007 during a Christmas dinner, Defendant Perkins was reflecting on her sales team's 2007 performance when she said that Stephen Adamson, a white counterpart of Plaintiff, had been thrown out of a veterinary hospital for misbehaving. (*Id*. at 5.) Mr. Adamson then "blurted out" in front of the team, "Damn right! I cursed that mother fucker out! I paid that bastard over $14,000 to prescribe my shit and he switched to

---

[2] Pfizer policy prohibited Plaintiff from purchasing "gift certificates, gift cards or vouchers" and giving them to animal healthcare providers or other customers. (Docket No. 34, Ex. O, attached to Plaintiff's Deposition (Ex. A).) The policy also provided that any program making use of gift certificates, gift cards or vouchers must be approved and managed by "NYHQ." (*Id*.)

Multi? Damn right!" (*Id.*) Defendant Perkins "abruptly tried to quiet [Mr. Adamson] and said, "'Stephen, you're not supposed to talk about that!'" (*Id.*)

Plaintiff understood this exchange to show that Defendant Perkins had a different standard for her as a black person as opposed to the standard for Mr. Adamson, a white person. (*Id.*) Plaintiff made an anonymous complaint about the discriminatory treatment of Defendant Perkins toward black employees on the hotline. (*Id.*)

In February 2008, Plaintiff wrote an email to Janice Beauchamp to inform her of this different treatment by Defendant Perkins. Ms. Beauchamp, an African-American female, was a Pfizer vice-president of human resources. (*Id.*) "Almost immediately thereafter," Plaintiff received a written warning from Defendant Perkins for giving Beth Shelton the $15 food voucher. (*Id.*)

Ms. Beauchamp met with Plaintiff during the week of February 25, 2008 in San Diego, California, to discuss Plaintiff's complaints. (*Id.*) Plaintiff told her that she thought it was unfair for her to receive a written warning for providing the voucher when Mr. Adamson "blatantly admitted wrong doing in paying a veterinarian over $14K to prescribe Revolution and Perkins covered for him." (*Id.*) Ms. Beauchamp advised Plaintiff that she would investigate the matter but to be patient because Defendant Perkins was on medical leave. (*Id.* at 6.)

Plaintiff states that she suffered severe emotional distress as a result of Defendant Perkins' discriminatory treatment. She sought treatment in March 2008 through the Pfizer Employee Assistance Program with Dr. Agatha Nody. (*Id*.) She was granted medical leave and sought treatment from Dr. Pamela Hartsfield. (*Id*.) Pfizer later demanded that Plaintiff pay back "thousands of dollars in benefits" when it denied Plaintiff additional medical leave. (*Id*.) Dr. Hartsfield diagnosed Plaintiff with work related anxiety and depression. (*Id*.) Plaintiff also had an independent medical examination by Dr. Roger Moore who diagnosed her with work related anxiety and stress. (*Id*.)

In January 2009, Plaintiff was advised that she was being laid off due to a corporate restructuring.[3] (*Id*.) This restructuring resulted in thirty-eight Pfizer animal health sales representative positions being eliminated. (Docket No. 39, Ex. G at 2.) Six of these positions were held by African American sales representatives and thirty-two were held by representatives of other races. (*Id*.)

On October 31, 2008, Plaintiff filed her charge of discrimination with the EEOC. (Docket No. 34, Ex. S to Plaintiff's deposition (Ex. A).) She complained of race discrimination and retaliation occurring through October 31, 2008. (*Id*.)

---

[3] In her Amended Complaint, Plaintiff does not allege that her termination was discriminatory or retaliatory.

Plaintiff filed her Amended Complaint in this action on May 7, 2009 raising six claims. (Docket No. 19.) Count 1, directed against both Defendants, is for negligent infliction of emotional distress. Count 2 against Pfizer asserts employment fraud based on the misrepresentations of Defendant Perkins. In Count 3, against both Defendants, Plaintiff raises a claim of intentional infliction of emotional distress. Count 4 is against Defendant Pfizer for negligent supervision and retention of Defendant Perkins and other employees who engaged in harassing and otherwise inappropriate workplace conduct. In Count 5, directed against Defendant Pfizer, Plaintiff raises claims of racial discrimination and harassment in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. Finally, Count 6, against Pfizer, is for retaliation under section 1981 and Title VII. (*Id*.)

Defendants argue that all counts should be dismissed. (Docket No. 34.)

## DISCUSSION

### A. <u>Summary Judgment Standard</u>

Summary judgment is appropriate only when no genuine issue of material fact exists. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. (*Id.*

at 255.) The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." *Temkin v. Frederick County Comm'rs,* 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." (*Id*. at 718-19 (citing *Anderson*, 477 U.S. at 247-48).) A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. *See, e.g., Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994); *see also Anderson*, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials.)

**B.** **Negligent infliction of emotional distress – Count 1**

Defendants Pfizer and Perkins argue that Plaintiff's claim of negligent infliction of emotional distress must be dismissed because she has not shown any "negligent" acts that could form the basis for liability. (Docket No. 34 at 10-11.) To succeed on this claim, Plaintiff must show something other than discriminatory conduct because such conduct is inherently intentional. *Thomas v. Northern Telecom, Inc*., 157 F. Supp. 2d 627, 637 (M.D.N.C. 2000). Plaintiff argues in briefing that a jury could determine that Defendant Perkins "engaged in the racial conduct but not with the intention of causing emotional distress." (Docket No. 35 at 19.) This argument misses the mark, however, as the standard is whether Defendant Perkins acted negligently and the resultant harm to Plaintiff was

-9-

foreseeable, not whether Defendant intended the harm. *Johnson v. Ruark Obstetrics and Gynecology Assocs., P.A.*, 327 N.C. 283, 395 S.E.2d 85, 97 (1990). Plaintiff has not presented evidence that Defendants Pfizer or Perkins negligently, as opposed to intentionally, engaged in the conduct outlined in the Amended Complaint. Therefore, this claim, directed at both Defendants, should be dismissed.

### C. Intentional infliction of emotional distress – Count 3

Under North Carolina law, a plaintiff alleging intentional infliction of emotional distress must prove: (1) extreme and outrageous conduct; (2) which is intended to cause and does cause; (3) severe emotional distress. *Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 340 S.E.2d 116, 119 (1986). Such extreme and outrageous conduct must go "beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community." *Guthrie v. Conroy*, 152 N.C. App. 15, 567 S.E.2d 403, 408-09 (2002). The alleged conduct of Defendant Perkins and other employees of Defendant Pfizer simply does not rise to this extreme level as a matter of law. *See id*. at 409-10. This claim against Defendants Pfizer and Perkins should also be dismissed.

### D. Employment fraud – Count 2

In order to show employment fraud, Plaintiff must establish: (1) a false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party. *Terry*

-10-

Case 1:08-cv-00826-JAB-PTS   Document 42   Filed 02/25/10   Page 10 of 20

*v. Terry*, 302 N.C. 77, 273 S.E.2d 674, 677 (1981). Plaintiff charges that Defendant Pfizer's top executives responsible for the implementation of the Revolution program, including Dan Kramer, trained her to provide monetary compensation to customers for using Pfizer products and then disciplined Plaintiff by written warning when she questioned the ethics of the program. (Docket No. 35 at 20.) Plaintiff's allegations do not match the elements of fraud. Plaintiff has not shown evidence of any false representation or concealment of a material fact by Pfizer. There is also no evidence of an intent to deceive. Plaintiff has not presented any evidence that Pfizer falsely represented that Plaintiff's personal decision to provide a food voucher to Beth Shelton was an acceptable substitute for or augmentation of the company's plan to resolve the bounced check situations. Therefore, Plaintiff cannot complain that Pfizer acted "fraudulently" when it disciplined her for her unauthorized action. This claim should be dismissed.

### E. <u>Negligent supervision and retention – Count 4</u>

North Carolina recognizes a cause of action against an employer for negligence in employing or retaining an employee whose wrongful conduct injures another. *Hogan*, 340 S.E. 2d at 123. However, before an employer can be held liable, the plaintiff must prove that the incompetent employee "committed a tortious act resulting in injury to plaintiff" and that prior to the act the employer knew of the employee's incompetence. *Id*. at 124. Because all of the tort claims raised by Plaintiff should be dismissed, Plaintiff has failed to show that

-11-

Case 1:08-cv-00826-JAB-PTS   Document 42   Filed 02/25/10   Page 11 of 20

Defendant Perkins committed a tortious act that injured Plaintiff. Accordingly, Plaintiff's claim of negligent supervision and retention by Pfizer should be dismissed.[4]

**F.      Retaliation – Count 6**

Plaintiff claims that "after [she] complain[ed] to Beauchamp about Perkins' discriminatory behavior, Perkins issued the plaintiff a written warning associated with a previous verbal admonishment related to the plaintiff providing Shelton with a food voucher." (Docket No. 35 at 21.) This argument encompasses the full extent of the retaliation claim set out in the Amended Complaint. *See* Docket No. 19, ¶ VI, Count Six. In order to establish a prima facie case of retaliation by Pfizer under both section 1981 and Title VII, Plaintiff must show that: (1) she engaged in protected EEO activity; (2) an adverse employment action was taken against her; and (3) there was a causal connection between the protected activity and the challenged retaliatory act. *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 656 (4th Cir. 1998); *see Takele v. Mayo Clinic*, 576 F.3d 834, 839 (8th Cir. 2009) (same standards for section 1981 and Title VII). The issuance of a written warning has been found to be a sufficiently adverse employment action. *See Snow v. Khazeni*, No. 1:08CV0070, 2009 WL 1751582, slip op. at *5 (M.D.N.C. June 19, 2009). Defendant Pfizer does not dispute that Plaintiff's complaint of discrimination to the company vice president of human resources, Janice Beauchamp, constitutes protected activity.

---

[4] Plaintiff presents argument concerning a claim of negligent hiring. (Docket No. 35 at 19.) However, Plaintiff did not plead such a claim and, as noted above, Plaintiff has shown no tortious act by an employee of Pfizer.

-12-

Nonetheless, Pfizer contends that Plaintiff cannot establish a prima facie case of retaliation. (Docket No. 34 at 14.) The question reduces to whether Plaintiff has presented sufficient evidence of a causal connection between her complaint of discrimination to Ms. Beauchamp and the written warning issued to Plaintiff by Defendant Perkins.[5] Plaintiff's written warning is dated January 2, 2008. (Docket No. 39, Ex. D.) Plaintiff acknowledged the warning on January 7, 2008. (*Id*.) The record is unclear as to the exact dates that Plaintiff called the Pfizer hotline to complain about discrimination. According to Plaintiff's affidavit, she first called the hotline anonymously and complained about the Revolution program and bounced checks. (Docket No. 35, Ex. A at 4.) Plaintiff states that approximately two days after "complaining anonymously" she was admonished[6] by Defendant Perkins for providing the food voucher to Beth Shelton. (*Id*.) This first call to the hotline could not be a causative factor under a claim of retaliation, however, because Plaintiff does not say that she complained about any discriminatory acts by Defendant

---

[5] There is no evidence that Ms. Beauchamp played any part in the issuance of the written warning. The evidence shows that Defendant Perkins issued the warning and that perhaps her superior, regional manager Odis Pirtle, was aware of it because he attended the Charlotte meeting with Plaintiff and Defendant Perkins to discuss the food voucher incident. (Docket No. 34, Ex. A at 247.) Following that meeting Plaintiff contacted Mario Antonelli, Pfizer director of human resources, to determine what the outcome of the meeting would be, but he apparently never got back in contact with Plaintiff. (*Id*. at 247-48.)

[6] This apparently refers to the oral admonishment which preceded the written warning. This oral admonishment occurred on or about December 5, 2007. (Docket No. 34, Ex. A at 227-28, 232-33.)

-13-

Perkins at that time. Further, any complaint made to the hotline was anonymous.[7] There is no evidence that Defendant Perkins became aware of this call before issuing the written warning.

Plaintiff next contacted the hotline sometime after the December 15, 2007 Christmas dinner during which Stephen Adamson made his outburst. (Docket No. 35, Ex. A at 5.) Plaintiff then "made an anonymous complaint about the discriminatory treatment of Perkins toward black employees through the hotline." (*Id*.) Once again, there is absolutely no evidence that Defendant Perkins became aware of this anonymous complaint before issuing the written warning.[8]

Plaintiff states that she sent an email to Janice Beauchamp in February 2008 to complain about treatment by Defendant Perkins. (*Id*.) Ms. Beauchamp met with Plaintiff to discuss her complaints in San Diego, California, during the week of February 25, 2008 and at another time in Greensboro, North Carolina. (*Id*.; Docket No. 34, Ex. A at 253; Docket

---

[7] In her deposition, Janice Beauchamp stated that calls to the hotline were received by a compliance representative who forwarded the complaint to Beauchamp by email. (Docket No. 35, Ex. G at 13-14.) There is no evidence that the complaint was sent to Defendant Perkins.

[8] In her deposition, Janice Beauchamp testified that based on an email she "knew right away that the complaint was made by" Plaintiff. (Docket No. 35, Ex. G at 15.) It is not clear whether this was one of the emails from a compliance representative or an email directly from Plaintiff. However, even if Plaintiff's "anonymous" hotline complaints were not in fact anonymous, there is still no evidence that Defendant Perkins became aware of the complaints prior to issuing the written warning.

-14-

No. 35, Ex. G.) It was not until after Ms. Beauchamp had met with Plaintiff, and Plaintiff complained about the written warning, that Ms. Beauchamp traveled to Charlotte, North Carolina, to meet with Defendant Perkins and advise her about Plaintiff's complaints. (Docket No. 35, Ex. G at 18-20, 23-25.) Therefore, the evidence tends to show that Defendant Perkins first became aware of Plaintiff's complaints to the Pfizer hotline or directly to Ms. Beauchamp only *after* Defendant Perkins had issued the written warning. There is no evidence in the summary judgment record to raise an inference that Defendant Perkins knew of Plaintiff's protected activities before she issued the written warning.

Because Plaintiff has failed to present evidence showing a causal connection between her complaints about discriminatory treatment and the written warning she thereafter received, this claim should be dismissed. *See Brower v. Runyon*, 178 F.3d 1002, 1006-07 (8th Cir. 1999) (no causal link shown where plaintiff failed to show that those responsible for termination knew about plaintiff's conversation with EEO officer).

**G.     Discrimination – Count 5**

In Count 5 of her Amended Complaint, Plaintiff complains of "discrimination and harassment" due to her race under Title VII and 42 U.S.C. § 1981. (Docket No. 19 at 9.) The standards under Title VII and section 1981 are the same. *Gairola v. Com. of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285-86 (4th Cir. 1985). In her memorandum opposing summary judgment, Plaintiff discusses only disparate treatment and a hostile work

-15-

environment. (Docket No. 35 at 13-16.) Therefore, this Court will examine these two types of claims.[9]

   1.   **<u>Disparate treatment</u>**

A prima facie case of disparate treatment in discipline is shown by Plaintiff presenting evidence that: (1) she was a member of a protected class; (2) the prohibited conduct of employees outside the protected class was as serious as the misconduct engaged in by Plaintiff; and (3) the employer imposed harsher disciplinary measures against her than against employees outside the protected class. *Brown v. Stafford County Pub. Schs.*, No. 97-1552, 1998 WL 382731, slip op. at *1 (4th Cir. June 10, 1998). The only cognizable disciplinary measure against Plaintiff in this action is the written warning she received. She did not allege in her Amended Complaint or in her EEOC charge of discrimination that her lay-off due to corporate restructuring was an example of disparate treatment.

Plaintiff complains that she was given a written reprimand "for participating in the same activity her white counterparts participated in." (Docket No. 35 at 15.) Nonetheless, Plaintiff has presented no evidence on whether disciplinary action was or was not taken against Stephen Adamson for what Plaintiff perceives to be conduct comparable to her

---

[9] Plaintiff also "contends that Perkins has a history, and pattern and practice of, discriminating against black employees who worked under her supervision." (Docket No. 35 at 14.) However, "pattern or practice claims can be asserted only in class actions." *Williams v. Henderson*, 129 Fed. App'x 806, 813 n.2 (4th Cir. 2005). Such evidence may be relevant to Plaintiff's other claims of discrimination, however.

-16-

providing Beth Shelton with a food voucher. In addition, there is no evidence showing that Mr. Adamson's "payment" of $14,000 to Dr. Shuport was outside company policy or was in any meaningful way comparable to Plaintiff's action in providing a food voucher to Beth Shelton. The only evidence presented of Mr. Adamson's alleged misconduct is what he blurted out during the Christmas dinner and Defendant Perkins' reaction at that time. In short, there is no evidence of either comparable misconduct by Mr. Adamson or more lenient discipline to him. On this record, there is not sufficient evidence upon which a jury could find disparate treatment.

### 2. Hostile work environment

To demonstrate a racially-hostile work environment, Plaintiff must show that she was the subject of conduct that was: (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and that (4) there is some basis for imposing liability on the employer. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001).

Defendant Pfizer argues that Plaintiff has failed to show that she was subjected to conduct that was sufficiently severe or pervasive to alter the conditions of her employment. (Docket No. 34 at 19-20.) During discovery, Defendant asked Plaintiff to list the racially harassing statements made to Plaintiff during her employment. (Docket No. 34, Ex. K attached to Plaintiff's Deposition (Ex. A).) Plaintiff listed the two August 2007 incidents

-17-

recounted above (the "ask" incident and Perkins' statement that Plaintiff's sales numbers were not on par with her white counterparts), the December 15, 2007 Stephen Adamson Christmas dinner incident, and the July 2006 incident discussed above when Defendant Perkins explained her higher standards for Plaintiff and Tiffany McGee. (*Id.*) Plaintiff relies upon these same incidents in her memorandum. (Docket No. 35 at 14-15.)

In determining whether a work environment is hostile to the point that it alters the conditions of employment, courts look to the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

The frequency of the harassing conduct that Plaintiff Houston complains of is, the Court finds, sporadic rather than concentrated or incessant or pervasive. The July 2006 incident and the August 2007 incident are separated by over a year. The sporadic nature of these incidents may be due in part to the fact that as a sales representative Plaintiff was in the field calling on her clients the majority of her working hours rather than in an office in constant contact with Defendant Perkins. However, that physical separation is a valid consideration when determining whether her working environment was hostile.

The harassing conduct of which Plaintiff complains is not sufficiently severe. Plaintiff has shown only one incident when Defendant Perkins used what could be seen as

-18-

a racial slur against her. That was when Defendant Perkins, herself an African-American, congratulated Plaintiff on her sales numbers by stating, "[W]ay to go, Negro." (Docket No. 34, Ex. A at 77.) A review of the conduct Plaintiff complains about reveals that Defendant Perkins' remarks, even if belittling and offensive, were often intended to raise Plaintiff's level of performance rather than to present obstacles to her better performance. Examples of this are Defendant Perkins' suggestions for Plaintiff to arrive early and stay late for meetings, to dress professionally, and to fully expound on her thoughts when writing reports.

The record does not show any physically threatening conduct. Although Plaintiff may well have been embarrassed by some of Defendant Perkins' comments, the evidence fails to show public humiliation because the comments were generally made to Plaintiff in private (such as when the veterinarian left the office during the "ask" incident), or made by private communications (email or phone call), or made when Plaintiff was with only one colleague (Tiffany McGee) and the comments were directed to both subordinates. The evidence of Defendant Perkins' treatment of Plaintiff's black colleagues does not change this analysis. (*See* Docket No. 35, Ex. B, Affidavit of Ashley Miller, and Ex. C, Affidavit of Derek Holland.)

Based on the entirety of the circumstances surrounding Plaintiff's work conditions, the Court determines as a matter of law, taking her averments as true, that Plaintiff Houston was not subjected to a racially hostile work environment.

-19-

## Conclusion

For the foregoing reasons, **IT IS RECOMMENDED** that Defendants' amended motion for summary judgment (Docket No. 33) be granted in full, and that this action be dismissed with prejudice.

/s/ P. Trevor Sharp
United States Magistrate Judge

Date: February 25, 2010